REVISED - March 17, 2000

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 98-20851

NORMAN MICHAELS; ET AL,

                                        Plaintiffs,

NORMAN MICHAELS, Executor of Estates of Martin Popowitz and
Harriet Loria Popowitz, Deceased,

                                        Plaintiff-Appellant,

                        versus

AVITECH INC, also known as Harger Aviation,

                                        Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

JANUARY 28, 2000

Before HIGGINBOTHAM and SMITH, Circuit Judges, and DUPLANTIER[*],
District Judge.

HIGGINBOTHAM, Circuit Judge:

     This is a negligence action arising from the crash of a
private plane.  Norman Michaels appeals the striking of his experts
and the grant of summary judgment in favor of Avitech, Inc.
Although we find that the plaintiff's experts were improperly
struck, we also find that no genuine questions of material fact
exist, even considering all of the plaintiff's experts and reports.
Thus we AFFIRM summary judgment in favor of the defendant.

_____

     [*]District Judge of the Eastern District of Louisiana, sitting
by designation.

Norman Michaels is the executor of the estates of two people killed in a Cessna plane crash.  In 1990, an aircraft service company known as Avitech replaced the right vacuum pump on the Cessna and attempted to repair oil leaks in the engine compartment. Nine days later, the left vacuum pump failed and was replaced by a different aircraft service company.

Each year between 1991 and 1993, the Cessna passed FAA required inspections.  A few days before March 1, 1994, a maintenance facility in New York detected an oil leak near the turbo controller oil inlet.  This facility was unable to repair that oil leak and recommended that the pilot investigate the leak further.

On March 1, 1994, the pilot of the aircraft took off from New Orleans under weather conditions which included severe thunderstorms within or surrounding his flight path.  The pilot was flying without a legally current license and without current legal authority to fly in instrument-only conditions.  During flight, the pilot reported the failure of pneumatic instruments that relied on the plane's gyroscopes which were powered by the vacuum pumps. Soon after this failure, radar contact was lost.  The plane broke up in midair and crashed in Alabama, killing all four on board and scattering debris across more than four miles.

The plaintiff's theory is that the left vacuum pump failed during flight, putting increased pressure on the right pump.  The right pump then failed because debris in the pneumatic lines made the right pump incapable of sustaining a higher than normal workload.  The failure of the two pumps then caused the gyroscopes to fail, as well as the instruments which relied on them.

Consequently, the pilot was unable to navigate away from the severe weather, which resulted in the Cessna's destruction.

It is undisputed that the left vacuum pump failed catastrophically before the crash, although the plane should have been able to generate sufficient vacuum pressure with only one pump working. The right vacuum pump was not intact after the crash, either, although it is disputed whether it failed before or after the plane was destroyed.

The plaintiff sued the vacuum pump manufacturer, along with numerous others, including Avitech, in Pennsylvania. The claims against Avitech were severed and transferred to the Southern District of Texas, pursuant to 28 U.S.C. § 1406.

The plaintiff claimed Avitech negligently installed the right vacuum pump, failed to repair oil leaks, and failed to clean the pump lines.

After the case had been on file for over a year, the district court held a pretrial conference and apparently questioned the plaintiff's ability to establish a case against Avitech. The plaintiff claimed he had an expert witness who believed Avitech was responsible. On June 12, 1997, the district court directed the plaintiff to designate, with a report, his expert witness that implicated Avitech. The federal rules require that the designation of expert witnesses "shall be made at the times and in the sequence directed by the court." FED. R. CIV. P. 26(a)(2)(C). The order to designate the expert was entered June 19, 1997, with a deadline of July 7, 1997.

On July 7, 1997, the plaintiff designated an expert, Douglas Stimpson, who provided a brief report. The plaintiff also

3

designated Scott Goodley, who also provided a brief report essentially duplicating Stimpson's.

On September 29, 1997, Avitech designated several expert witnesses with their reports. At a conference the same day, the court directed Avitech to file its motion for summary judgment on causation by October 31.

On October 29, 1997, two days before Avitech had to file its motion for summary judgment, the plaintiff's attorney sent Avitech a 21-page fax which included radar plots and reports from previously undisclosed experts. Over the next few days, the plaintiff also sent Avitech a copy of a "Supplemental Witness/Fact Witness Designation" identifying the four new expert witnesses and providing a significantly revised and expanded report from Stimpson; the plaintiff also sent a correction to his "Supplemental Expert Witness/Fact Designation," as well as a "Second Supplemental Expert Witness Designation."

Avitech moved to strike the plaintiff's original report because it was so insubstantial as to not meet the court's original order. Avitech moved to strike the subsequent reports as untimely. The district court struck them all. The district court entered summary judgment in favor of the defendant, and the plaintiff appealed.

## II.

The district court's June 12, 1997, order required that "the plaintiffs must designate their expert with a report that implicates Avitech and any three witnesses they believe need to be deposed." The plaintiff's original expert designation and report, although brief, at least implicates Avitech by providing some

4

theory of Avitech's negligence with respect to equipment whose failure was implicated in the crash.

Stimpson's report claims that his examination of the wreckage discovered debris in the pneumatic lines. Because both pumps feed into the same lines, the replacement of either pump could have contaminated these lines if the pump lines were not properly cleaned after installation. Because both pumps were replaced in 1990, it is conceivable that either or both installations failed to properly clean the lines or otherwise introduced contamination.

Stimpson's report, however, provides no direct evidence that Avitech failed to clean the pump lines or negligently installed the pump. The maintenance records cited in Stimpson's report indicate that Avitech blew out the lines, as required, and Stimpson gives no reason for the claim that the pump was negligently installed.

However, Stimpson did note that the maintenance records indicated that Avitech found numerous oil leaks but did not correct them. From this, Stimpson concluded also that the failure to correct the oil leaks contaminated the pneumatic system which led to the failure of the pumps.

Stimpson's report, then, facially establishes that the pneumatic system may have been contaminated from oil leaks which Avitech failed to repair. Even assuming that Avitech cleaned the lines and that the second maintenance facility perhaps did not, Stimpson's report still "implicates" Avitech, since it pinpoints them as one source of contamination. If both Avitech and the subseqeuent facility were sources of contamination, however, that does not necessarily relieve Avitech of liability, so long as the sources of contamination combined to create a contaminated environment which, through a string of events, caused the plane to

5

crash. In such an instance, the contamination could be seen as an indivisible harm which creates joint and several liability for the parties whose negligence created it. See, e.g., Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1095 (5th Cir. 1973); Amstadt v. United States Brass Corp., 919 S.W.2d 644 (Tex. 1996) (both citing Landers v. East Tex. Salt Water Disposal Co., 248 S.W.2d 731 (Tex. 1952)); cf. Chemical Exp. Carriers, Inc. v. French, 759 S.W.2d 683 (Tex.App.-Corpus Christi 1988, writ denied) (ground crew's negligent failure to detect contaminated jet fuel did not supersede the negligence of the fuel company which delivered contaminated fuel).[1]

Thus, we find that the Stimpson's original report at least "implicated" Avitech. The district court, however, struck the report because it did not live up to the standards of Sierra Club v. Cedar Point Oil Company, Inc., 73 F.3d 546 (5th Cir. 1996), which states that expert reports should be "detailed and complete" so as "to avoid the disclosure of 'sketchy and vague' expert information." Id. at 571. Sierra Club found no abuse of discretion when the district court decided that a plaintiff's expert reports violated a discovery order because the reports were brief and conclusory. Id. Unlike the present case, however, the plaintiff in Sierra Club essentially admitted that it had not complied with the discovery order, and thus compliance was not at issue so much as the sanction actually imposed. Id. at 571 n.46, 572-73.

---

[1]For the purposes of this appeal, we have adopted the parties' implicit assumption that Texas substantive law governs the plaintiff's negligence claims.

6

Furthermore, in Sierra Club, the district court had expressly adopted a discovery plan, and it was an "accelerated" plan. Id. at 569. With respect to experts, each party in Sierra Club had been ordered to prepare "a complete statement of all opinions to be expressed and the basis and reasons therefor." Id. at 570 (emphasis added). Thus, the plaintiff's failure in Sierra Club to provide complete disclosure was an admitted violation of an explicit and unambiguous discovery order in the context of a previously adopted and accelerated discovery plan.

In this case, however, the intended purpose of the order at issue is ambiguous. The plaintiff claims that the district court doubted that the plaintiff could find any negligence on the part of Avitech; thus, the district court merely wanted disclosure of some evidence of Avitech's negligence. The defendant claims that the district court doubted that the plaintiff could prove negligence, causation, and defeat the defendant's affirmative defenses; thus, the district court wanted the plaintiff to disclose all of his expert evidence and theories.

Because the pretrial meetings were not recorded, we have little evidence which reveals their content. On file is an affidavit by an attorney for the other plaintiff below who took part in both the June and September conferences. According to her sworn statement, the parties and court "did not discuss a discovery schedule or a trial date" at the June 12, 1997 conference, which was directed primarily toward the issue of abatement. Furthermore, according to the affidavit, it was not until the September conference that the court expressed doubt as to the sufficiency of the plaintiff's expert reports and set a briefing schedule for Avitech's summary judgment motion.

7

Consequently, it was the plaintiff's alleged belief that the June 19, 1997 order denying abatement only required him to designate one expert who could point to some maintenance negligence on the part of Avitech, rather than designate and disclose all potential experts and expert opinions regarding negligence, causation, and the affirmative defenses.

The district court expressly found the plaintiff's understanding to be "totally unreasonable" and consequently ruled that the plaintiff had violated the discovery order by not disclosing all experts and opinions at once. As a sanction for violating the discovery order, the district court struck all of the plaintiff's expert witness designations.

While such a sanction may sometimes be appropriate for the violation of discovery orders, we can find no violation in this case because the order allegedly violated does not on its face require complete disclosure of experts and opinions, nor was the order part of a current discovery plan, let alone an accelerated plan.

Instead, the order simply instructed the plaintiff to designate one expert and report which could implicate Avitech, which the plaintiff did. Given that the district court expressed skepticism at the plaintiff's case, it would make sense to require a brief initial disclosure on the part of the plaintiff, for if the plaintiff could not overcome that low hurdle, then the case could be dismissed. As such, the plaintiff's alleged interpretation is tenable.

The defendant suggests that the district court's extreme measures resulted from the court's belief that the plaintiff tokenly complied with the literal wording of the initial order but

8

purposefully ignored the common understanding between the parties and the court in order to gain a tactical advantage by the late designation of experts. While such bad faith might warrant the result in this case, the district court accepted the plaintiff's understanding of the order at face value, yet still found it to be unreasonable.

A district court has wide latitude in determining whether disclosure is "detailed and complete," at least when the discovery order requests complete disclosure. See, e.g., Sierra Club, 73 F.3d at 571-72 n.46. However, when a discovery order fails to specify complete disclosure, no current or accelerated discovery schedule is in place, and the plaintiff has some reason to believe that less than full disclosure is required, then the discretion to find a violation must likewise be reduced. Thus, given the record before us, we find that it was an abuse of discretion to hold that the plaintiff's initial disclosures violated the discovery order. Consequently, the plaintiff's supplemental and rebuttal reports should not have been struck since it is not disputed that these reports were timely filed under the rules.

The district court was justified in his skeptical view of the case, as we will explain, and the expert testimony he struck may not have survived a Daubert hearing. While it may be that the district court believed it deprived plaintiff of little by his order, the record reasons for it are not sufficient.


III.

It remains to determine whether the plaintiff can withstand summary judgment, even considering all of his experts and reports. See, e.g., In re TMI Litigation, 193 F.3d 613, 716 (3rd Cir.1999),

9

(considering whether improperly excluded expert evidence sufficed to create a genuine issue of material fact), amended by Nos. 96-7623, 96-7624, 96-7625, 2000 WL 18950 (3d Cir. Jan 04, 2000).

Our review of the summary judgment record is de novo and summary judgment can be affirmed on any legally sufficient ground, even one not relied on by the district court. See BMG Music v. Martinez, 74 F.3d 87, 89 (5th Cir. 1996). Fact questions are viewed in the light most favorable to the nonmovant. See Hassan v. Lubbock Indep. Sch. Dist., 55 F.3d 1075, 1078 (5th Cir.1995). However, only materials in the pretrial record that would have been admissible evidence can be considered. See Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir.1987). After reviewing the complete summary judgment record, we find that no genuine issue of material fact exists which would preclude summary judgment for the defendant. See FED. RULE CIV. PROC. 56(e).

Essentially, the plaintiff's theory is that a particular chain of events which began with the defendant's negligence in 1990 led to the fatal crash in 1994. At the summary judgment hearing, however, the plaintiff abandoned his theory that the oil leak caused the plane crash. Plaintiff's counsel at the hearing noted, "I think we're getting all bogged down in the oil leak when we shouldn't be, because the problem that caused this airplane crash in our view is not the oil leak." The plaintiff has also abandoned the theory on appeal by failing to argue the theory in its briefs except to mention that "Michael's expert faulted Avitech for not taking care of the leak." Brief of Appellant at 44.

The abandonment of the theory makes sense, even though there was some evidence that after Avitech located an oil leak and made repairs, there was still some oil leaking. However, it was

10

undisputed that the potential oil leak was at the bottom of the engine and the vacuum pumps were at the top. The plaintiff's expert never offered any credible theory as to how an oil leak could have leaked upward to contaminate the vacuum pumps other than to simply reiterate that the oil leak could contaminate the general environment. Furthermore, it was undisputed that three annual inspections of the aircraft engine between 1990 and 1994 that searched for oil leaks found none. The only oil leak ever detected was found near the left vacuum pump days before the fatal crash. A New York facility was unable to repair this leak and instead recommended that the pilot investigate it further.

Because the plaintiff's expert had no rational explanation as to why the first oil leak mattered, given that it disappeared after 1990, yet the 1994 oil leak did not matter, despite the fact that it was near the pump which catastrophically failed, there was insufficient evidence to send the oil leak theory to a jury. Thus, this theory cannot survive summary judgment, even if we assume the theory is properly before us.

Consequently, the plaintiff must stake his case on the allegation that Avitech negligently installed the right vacuum pump and contaminated the pump lines. Assuming such negligence occurred, the plaintiff argues that over time this contamination worked its way into the system and during the fateful flight four years later, the contamination led to a failure of the left vacuum pump, which then placed an increased load on the right pump. The right pump then failed, under the increased workload, because of the contamination in the system. The failure of both pumps caused the gyroscopes to fail, and the failure of the gyroscopes caused certain instruments to fail. The lack of instruments prevented the

11

pilot from navigating away from the most severe weather, and then the plane was destroyed by a storm that the pilot could not escape. This is quite a long chain of events, although it is not an inconceivable sequence. In fact, a cursory review of the record reveals at least some evidence that both pumps and the gyroscopes failed during flight, and that the pump system was contaminated.

The defendant argues that the pilot was a superseding cause of the accident because he took off in bad weather after receiving several warnings and because he did not have a current license or instrument rating. The record evidence, however, reveals a "battle of the experts" as to whether the weather conditions made it unreasonable for a pilot to take off that morning. Thus, summary judgment is precluded as to the pilot's decision to fly.

It is true that some courts have held that the violation of Federal Aviation Regulations is negligence as a matter of law. See Associated Aviation Underwriters v. United States, 462 F. Supp. 674, 680 (N.D. Tex. 1978) (citing Gatenby v. Altoona Aviation Corp., 407 F.2d 443 (3rd Cir. 1969); Gas Service Co. v. Helmers, 179 F.2d 101 (8th Cir. 1950)). However, the violation of licensing regulations is often an exception to the general rule that the violation of a safety regulation or statute is negligence per se. See Duty v. East Coast Tender Service, Inc., 660 F.2d 933, 948–49 & nn. 1-2 (4th Cir. 1981) (in [*sic*] banc) (Hall, J. dissenting) (collecting cases from twenty jurisdictions, including Texas, which have a licensing exception).

One reason for having a licensing exception is that there may be reasons a license has not been renewed that do not relate to the operator's lack of skill. See RESTATEMENT (THIRD) OF TORTS, § 12 cmt. h (D.D., 1999). For the purposes of this case, however, it does

12

not matter whether the violation is negligence per se or merely evidence of negligence. In either case, to win on summary judgment, the defendant must show that such negligence was the sole proximate cause of the accident as a matter of law. See, e.g., Duty v. East Coast Tender Service, Inc., 660 F.2d 933, 947 (4th Cir. 1981) (holding that proximate cause is still an issue for the jury even if the violation of a licensing regulation is negligence per se). If the jury believes the plaintiff's theory of the case, the fact that the pilot did not have a current license or instrument rating may be irrelevant, since the allegation is that the plane crashed because it was rendered instrumentless and the pilot was unable to navigate out of the bad weather. Under such conditions, a jury might find that the lack of instrumentation was a proximate cause of the accident. For these reasons, the defendant's affirmative defense cannot prevail on summary judgment.

Nevertheless, the plaintiff has failed to provide evidence on the issue of Avitech's negligence sufficient for a reasonable juror to find for the plaintiff by a preponderance of the evidence, which mandates summary judgment in Avitech's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51 (1986).

The plaintiff's contention is that Avitech's negligent installation of the right pump contaminated the system. Indeed, if Avitech negligently installed the pump and either introduced contamination or failed to remove contamination, then there is a reasonable inference that such contamination led first to the failure of the left pump nine days later, and then led to the failure of both pumps less than 200 flight hours after that.

However, the plaintiff still must have sufficient evidence to generate a jury question that Avitech was negligent in its

13

installation of the right pump.  The plaintiff claims that Avitech did not clean out the pump lines and check the system.  However, the maintenance records indicate that Avitech did.  The plaintiff's assertion to the contrary is based on three facts: (A) debris was found in the system four years later, after the crash; (B) the left pump failed nine days after Avitech's installation of the right pump; and (C) Avitech only recorded 3.2 hours of labor for replacing the right vacuum pump, cleaning the lines, and checking the system.  We examine each in turn.

A.   Pump System Debris

After Avitech replaced the right pump, the left pump failed and was replaced a few days later.  Four years later, during the fatal flight, the left pump failed again followed, allegedly, by the failure of the right pump.  Additionally, the engine was cleaned at least four times after Avitech replaced the right pump.  According to the evidence, all of the following can introduce contamination into the system: the negligent installation of a pump, the actual failure of a pump, engine cleaning, and even normal operation.  In this case, debris was found after (1) four years of operation, (2) four engine cleanings, (3) three pump failures, (4) the installation of the left pump, and (5) the discovery of an oil leak near the left pump, which all agree was never fixed.

Given the variety of intervening events, the finding of debris alone cannot support any rational inference that Avitech's installation of the right pump was negligent, given that the plaintiff's experts wholly fail to address and rule out the numerous other potential causes.  Had the expert's opinions

14

undergone a <u>Daubert</u> analysis, they likely would not have been admissible, since an important factor under <u>Daubert</u> is the testability of an expert's conclusions and theory. <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 592 (1993). In this case, expert testimony was necessary to establish the likely cause of an aircraft disaster. A necessary ingredient of such theorizing, however, is the exclusion of alternative causes. <u>See</u> <u>In re Paoli R.R. Yard PCB Litigation</u>, 35 F.3d 717, 757, 759 n.27 (3rd Cir. 1994).

Although the plaintiff's expert's theory that debris was evidence of negligence would likely have been inadmissible at trial under <u>Daubert</u> because it failed to exclude other causes, and although only admissible evidence should be considered at summary judgment, it is perhaps remiss to attempt a <u>Daubert</u> inquiry at the appellate level when the district court did not perform one.[2] <u>See</u> <u>Cortes-Irizarry v. Corporacion Insular De Seguros</u>, 111 F.3d 184, 189 (1st Cir. 1997). However, in determining whether the plaintiff has sufficient and competent summary judgment evidence for a given issue, it would be equally remiss for us to ignore the fact that a plaintiff's expert evidence lacks any rational probative value. For if evidence gives rise to numerous inferences which are equally plausible, yet only one inference is consistent with the plaintiff's theory, the plaintiff has failed to offer evidence which is "significantly probative," <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986), absent at least some evidence that

---

[2]Thus, we in no way suggest that the **<u>Daubert</u> gatekeeping function may be transferred from the district court to the court of appeals.**

15

excludes the other potential causes. The reason for this is as follows:

Under Texas law, if a plaintiff has evidence that a defendant's negligence is a proximate cause of an accident, the plaintiff need not make any attempt to rule out other proximate causes of the accident because "[t]here can be more than one proximate cause of an injury, and all persons whose negligent conduct contributed to the injury are responsible for it." Coleman v. Equitable Real Estate Investment Management, Inc., 971 S.W.2d 611 (Tex.App.-Dallas 1998).

However, if the plaintiff's only evidence of the defendant's negligence is an inference from the observation of a dangerous condition such as contaminated pump lines, then the plaintiff must at least make an attempt to rule out other likely sources of negligence because such an inference is essentially a form of res ipsa loquitur, even if the plaintiff does not label it as such.

Notwithstanding the fact that res ipsa is only applicable when the condition in question was under the exclusive control of the defendant – which was not the case here – res ipsa also requires an exclusion of alternative causes. See, e.g., Harris v. National Passenger Railroad Corp., 79 F.Supp.2d 673, 679 (E.D.Tex. 1999) ("While res ipsa loquitur alleviates the plaintiff of the burden of directly proving causation, it is only applicable where the likelihood of causes other than the defendant are ruled out . . . .").

Because the plaintiff's expert made no attempt to rule out the numerous other sources of contamination of the alleged debris, the evidence was not "significantly probative" as to the issue of Avitech's negligence, and thus does not preclude summary judgment.

16

B.   Avitech's Time Record

The plaintiff claims that 3.2 hours was insufficient time for Avitech to correctly install the right pump, clean the lines, and check the system, yet the plaintiff gives no explanation for this claim.  If such an installation, cleaning, and check takes even a fast mechanic over 7 hours, for example, then the evidence would support an inference that perhaps the pump was installed but the lines were never cleaned and the system never checked.  However, the plaintiff's expert never justifies the conclusory assertion that 3.2 hours was insufficient time to do the job properly.  As such, the plaintiff's evidence, without more, is insufficient to preclude summary judgment on the issue of negligence.  See, e.g., Boyd v. State Farm Ins. Companies, 158 F.3d 326, 331 (5th Cir. 1998) ("For the purposes of summary judgment under Fed.R.Civ.P. 56(e), an expert affidavit must include materials on which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion."); cf. General Elec. Co. v. Joiner, 522 U.S. 136, 519 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.").


C.   The Left Pump Failure

The plaintiff claims that the failure of the left pump nine days after the failure of the right pump supports an inference that the right pump must have been negligently installed.  This contradicts the plaintiff's own theory that the failure of one pump puts such an increased load on the other pump that premature failure of the other pump is expected and not uncommon.  If we

17

assume the plaintiff's own theory, however, then when the right pump failed in 1990, the left pump was immediately stressed; thus, even before Avitech replaced the right pump, the left pump would have sustained injury that brings risk of premature failure. Moreover, it is undisputed that the left pump failure occurred at the normal life expectancy of the left pump. Specifically, the left pump failed at 700 hours, while its warranty was for only 400 hours. Avitech's undisputed expert testimony stated that the left pump's life span was about what could be expected. The plaintiff still insists, however, that the failure of the left pump is evidence that Avitech negligently installed the right pump.

While the proximity in time of the 1990 pump failures might generate some speculation that a problem existed with the installation of the right pump by Avitech, the plaintiff's expert gives no analysis of the other potential causes of the left pump's failure, such as earlier failure of the right pump or the age of the left pump. In fact, it is conceivable that a problem with the left pump led to the premature failure of the right pump before the left pump initially failed. As with the case of the pump debris, the plaintiff's experts do not discuss let alone exclude the alternative causes of the left pump's failure. Thus, the expert theories on this point are simply insufficient for a reasonable juror to find by a preponderance of the evidence that Avitech committed negligence. See Richoux v. Armstrong Cork Corp., 777 F.2d 296, 297 (5th Cir. 1985) ("The inferences drawn from the record, however, must be rational and reasonable, not idle, speculative, or conjectural.").

Because none of the plaintiff's inferences of Avitech's negligence are sufficient to support finding of negligence, they do

18

not suffice to create a genuine issue of material fact that would preclude summary judgment.  See, e.g., <u>Krim v. BancTexas Group, Inc.</u>, 989 F.2d 1435, 1449 (5th Cir. 1993) (summary judgment is appropriate if "nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation"); <u>see also</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 596 (1993) (if "the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . .to grant summary judgment").  For these reasons, we AFFIRM the grant of summary judgment.

AFFIRMED.