# United States Court of Appeals for the Fifth Circuit

———————

No. 25-40410

———————

United States Court of Appeals
Fifth Circuit

**FILED**

May 7, 2026

Lyle W. Cayce
Clerk

Perry Bonin; Ace Chandler; Michael Manuel; Robert Acreman; Jacqueline Acreman, *Et al.*,

*Plaintiffs—Appellants*,

*versus*

Sabine River Authority of Texas; Sabine River Authority, State of Louisiana,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:19-CV-527

———————————————————

Before King, Southwick, and Haynes, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

On March 9, 2016, in response to a record-breaking storm, the Toledo Bend Dam opened nine of its eleven spillways into the Sabine River. The Plaintiffs in this case, 700 downriver landowners flooded during the storm, brought a takings claim against the operators of the dam and sought compensation for damage done to their property by the high waters. The

district court granted summary judgment for the Defendants. The Plaintiffs timely appealed. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

The course of the Sabine River demarcates more than half of the border between Texas and Louisiana. Toledo Bend Dam, built as a collaboration between Louisiana and Texas, restricts the Sabine, forming the Toledo Bend Reservoir, the largest non-federal reservoir in the country. Ryan M. Seidemann, *Water and Power: The Sabine River Authority of Louisiana*, 25 TULANE ENV'T L.J. 389, 391 (2012). Two state entities jointly manage the Toledo Bend Reservoir: the Sabine River Authority of Texas ("SRA-T") and the Sabine River Authority, State of Louisiana ("SRA-L"). We will refer to them collectively as "the Authorities." Flowing south from the reservoir, the Sabine River eventually empties into an estuary of the Gulf of Mexico.

SRA-T and SRA-L are co-licensed by the Federal Energy Regulatory Commission ("FERC") to operate and maintain the Toledo Bend Hydroelectric Project, which includes the dam and spillways at issue in this case. The two Authorities received their first license to construct, operate, and maintain the Project in 1953. FERC issued a second license to the Authorities in 2014.

In March 2016, Toledo Bend Reservoir suffered a period of intense rainfall, with areas receiving between 20 and 25 inches of rain over a 31-hour period. According to a post-incident report, the inflows of water into the reservoir exceeded "the equivalent of a 500-year flood." To avoid "overtopping" of the dam, which can "ultimately lead to failure of the dam," the Authorities incrementally opened all nine operational spillways, releasing water from the reservoir into the Sabine River. The spillways did not fully

close until more than three weeks later. Flooding downriver of the dam caused widespread damage in areas along the Sabine River.

The Plaintiffs, over seven hundred landowners, filed suit under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Texas, alleging the Authorities violated the Fifth Amendment's takings clause. SRA-L promptly moved for dismissal under Federal Rule of Civil Procedure 12(b)(1) based on sovereign immunity. The district court denied the motion. On appeal, this court affirmed the district court's denial. *Bonin v. Sabine River Auth.*, 65 F.4th 249, 259 (5th Cir. 2023).

During discovery, both the Plaintiffs and SRA-T designated their expert witnesses and submitted expert reports. The Plaintiffs designated three experts from Rimkus Consulting Group: Douglas Beal, Kieran Purcell, and Ian M. Knack. Together, the three submitted a single report.

SRA-T filed a motion to exclude the report and opinions of the Plaintiffs' experts because they "relied predominately on a thesis of a graduate student at the University of Louisiana at Lafayette." That graduate student, Achutam Baral, "had no prior experience performing hydrologic and hydraulic modeling," and SRA-T averred his models were "replete with errors."

SRA-T also filed a motion for summary judgment, arguing that the Plaintiffs had no property right in protection from floodwaters caused by an act of God, that the Plaintiffs could not show that the Toledo Bend Dam caused their injuries; and that the Plaintiffs' claims were barred by the statute of limitations.[1]

---

[1] The motion was ultimately dismissed without prejudice while SRA-L pursued its appeal.

No. 25-40410

In their responses to both motions, the Plaintiffs attached affidavits by Purcell and Knack that again explained their conclusions and responded to the objections to the Baral models.  SRA-T later filed a motion to strike the new affidavits as untimely expert opinions.  The district court referred that motion and the motion to exclude to a magistrate judge.

The magistrate judge granted the motion to strike, finding that the Plaintiffs had "impermissibly submitted expert evidence after the designation deadline."  The magistrate judge concluded that the Plaintiffs did not "adequately explain[] why they waited until after SRAT filed its Motion to Exclude to submit the affidavits."  The Plaintiffs did not object to the ruling.

Almost two years later, with the issue of sovereign immunity resolved, the Authorities jointly moved for summary judgment, repeating many of the same arguments made by SRA-T in its original motion for summary judgment.  Additionally, they asserted that the opening of the dam was not a compensable taking, that the Plaintiffs' claims were barred by the necessity doctrine, that the Plaintiffs' claims were barred by collateral estoppel; and that the Plaintiffs claims were barred by *res judicata*.

In the response to that motion, the Plaintiffs attached Purcell and Knack's already-struck affidavits.  The Authorities moved to strike the revived affidavits; the district court granted the motion without explanation.

Later, the district court granted the Authorities' motion for summary judgment.  The district court explained that the Plaintiffs had cognizable property interests in the land affected by the flood but had failed to produce sufficient evidence to create a genuine dispute of material fact on whether a taking of those interests had occurred.  In addition, the court held that the Plaintiffs had not created a genuine dispute of material fact on the Authorities' assertion that the opening of the spillways was a necessary

4

response to an emergency and therefore shielded from liability by the necessity doctrine.

The Plaintiffs timely appealed.

## DISCUSSION

The Plaintiffs argue that the district court erred 1) in striking their experts' affidavits and failing to reconsider that decision; and 2) in granting summary judgment for the Authorities. We take the issues in that order.

### I.    The Striking of the Experts' Affidavits

"We review a district court's exclusion of expert testimony for abuse of discretion." *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 369 (5th Cir. 2016) (citing *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 569 (5th Cir. 1996)). "[I]t is unusual for an appellate court to find abuse of discretion in these matters." *Sierra Club*, 73 F.3d at 569 (quoting *O'Malley v. U.S. Fid. and Guar. Co.*, 776 F.2d 494, 499 (5th Cir. 1985)). This court considers four factors to determine whether a district court properly excluded expert testimony as a sanction to violating a discovery order: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *C.F. Bean*, 841 F.3d at 372 (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990)).

The Plaintiffs do not contest that the Purcell and Knack affidavits had previously been struck by the magistrate judge, that they did not object to that order, or that the affidavits were untimely per the district court's scheduling order. Instead, they contend the district court abused its discretion in excluding the affidavits under the circuit's four-factor test.

In summary, the Plaintiffs argue there was no prejudice in permitting the untimely affidavits because the Authorities "had known full well for

nearly two years" the contents of the affidavits. In addition, they emphasize the district court's statement in its order denying reconsideration that if the Plaintiffs had sought an extension for designating experts, the court would have considered their designations timely. According to the Plaintiffs, "[s]uch an elevation of form over substance was in error and should be reversed."

The errors in the Plaintiffs' form, however, are substantive or at least substantial. The affidavits violate two court orders: the district court's scheduling order and the magistrate judge's unobjected-to order striking the affidavits as untimely. A party may not disregard a discovery sanction by simply resubmitting the offending material. *See* FED. R. CIV. P. 72(a) ("A party may not assign as error a defect in the order not timely objected to.").[2] If the affidavits were initially untimely, they were even more untimely two years later.

Critically, the Plaintiffs never sought the district court's permission to reassert the untimely and already-struck expert opinions. The fact that the district court may have granted permission is irrelevant. Two years and much motions practice had passed since the striking of the affidavits. In all that time, the Authorities had no notice that the Purcell and Knack affidavits would return from the grave. They also had no opportunity to object to the

---

[2] "[O]ur review of a district court's sanction for the violation of one of its discovery orders also 'necessarily includes a review of the underlying discovery order.'" *F.D.I.C. v. Conner*, 20 F.3d 1376, 1381 (5th Cir. 1994) (quoting *Hastings v. North E. Indep. Sch. Dist.*, 615 F.2d 628, 631 (5th Cir.1980)). By failing to object to the magistrate judge's ruling in the district court, the Plaintiffs may well have waived their ability to object to that order. This opinion should not be taken to countenance the reassertion of stricken evidence in lieu of objection or appeal in the hope of a second bite at review by this court. Nonetheless, because we find that the district court did not abuse its discretion, we do not address this issue here.

disinterring.  A request for an extension of the district court's scheduling order would have provided both.

In addition, allowing the affidavits to return at the final hour would be highly prejudicial.  The district court found that denying the motion to strike would cause the Authorities "severe prejudice" because "Defendants would then be required to re-do expert designations and briefings in response to Knack and Purcell's affidavits, thereby prolonging the nearly six-year-old case."  We agree.

The district court did not abuse its discretion in striking the Purcell and Knack affidavits or denying the Plaintiffs' motion for reconsideration.[3]

## II.     *Summary Judgment*

The Plaintiffs also contest the district court's grant of summary judgment to the Authorities.  We review the district court's grant of summary judgment *de novo*.  *Rogers v. Bromac Title Serv., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014).  Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The district court granted summary judgment on two grounds: 1) the Plaintiffs had failed to meet their summary judgment burden to show a genuine dispute of material fact on whether the flooding was a taking, and 2) the Plaintiffs had failed to provide evidence refuting the Authorities'

---

[3] The Plaintiffs also assert that SRA-L should not have been able to "obtain[] the relief of striking the Purcell and Knack affidavits" because SRA-L did not file its answer to the Plaintiffs' complaint until after the magistrate judge had already struck the affidavits. The Plaintiffs fail to cite any authority for this argument and, accordingly, we consider it improper. *See United States v. Olguin*, 643 F.3d 384, 399 (5th Cir. 2011).  Regardless, the striking of an affidavit as the sanction for a plaintiff's violation of a discovery order is not defendant-specific.

necessity defense.  We agree on the first point and, accordingly, do not reach the second.

The Fifth Amendment prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V.  The Supreme Court has often stated that the Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).  Because of the "nearly infinite variety of ways in which government actions or regulations can affect property interests," the Supreme Court has cautioned that there are no "magic formula[s]" for resolving takings claims and  "most takings claims turn on situation-specific factual inquiries." *Id.* at 31–32.

"No magic formula," but *Arkansas Game* does provide guidance. This is the first time this circuit has applied that guidance.  The Supreme Court held that "government-induced flooding of limited duration may be compensable" under the Takings Clause and set out considerations for courts to apply to such claims. *Id.* at 34.  The issue the Court addressed was whether there was a temporary-flooding exception to the Takings Clause. *Id.* at 31.  The Court held there is not. *Id.* at 40.  To reach that conclusion, the Court distinguished a prior case rejecting a takings claim brought by a landowner whose property was repeatedly flooded when a nearby canal built by the government overflowed. *Id.* at 34–35 (discussing *Sanguinetti v. United States*, 264 U.S. 146, 147 (1924)).  There, according to the Court, the "outcome rested on settled principles of foreseeability and causation." *Id.* at 34. One of the critical flaws in the landowner's argument a century ago was that he had "failed to show a causal connection between the canal and the increased flooding, which may well have been occasioned by changes in

weather patterns." *Id*. This was "more than sufficient to dispose of the property owner's claim." *Id.*

The *Arkansas Game* Court provided factors to be considered when weighing whether a taking of this sort has occurred: 1) the duration of the government invasion of the property right; 2) whether the invasion was the intended or foreseeable result of government action; 3) the landowner's reasonable investment-backed expectations in the land's use; and 4) the severity of the invasion. *Id*. at 38–40. Several cases from the Court of Appeals for the Federal Circuit and the Court of Federal Claims have added causation as a fifth factor. *E.g.*, *Orr v. United States*, 166 Fed. Cl. 1, 50–51 (2023).

The district court here admirably considered each factor before granting summary judgment. In context, however, we believe that *Arkansas Game* is best read to stand for the proposition that causation is a necessary prerequisite for a Takings Clause claim. In other words, the lack of sufficient evidence of causation is "more than sufficient to dispose" of a takings claim. *Arkansas Game*, 560 U.S. at 34.

Causation as a prerequisite finds support from other courts. Even in *Orr*, for example, which listed causation as one of the five factors, the Court of Federal Claims held: "Because plaintiffs have failed to carry their burden to establish that the Bureau of Reclamation's actions . . . caused the flooding of plaintiffs' properties, plaintiffs cannot succeed on their takings claims under the *Arkansas Game & Fish Commission* analysis." 166 Fed. Cl. at 64–65 (citation omitted). The Federal Circuit has also explained that when "plaintiffs failed to show that government action . . . caused their injury, the government is not liable for a taking under the Fifth Amendment." *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1368 (Fed. Cir. 2018). We agree.

Accordingly, we first analyze whether the Plaintiffs have shown a genuine dispute of material fact as to causation. Finding that they have not, we do not address the four factors outlined in *Arkansas Game*.

### A.    *Causation*

In this case, the district court applied the Federal Circuit's standard for causation in cases of temporary flooding caused by government-operated dams: whether "the government's construction or operation of the [dam] subjected their lands to any additional flooding above what would have occurred in consequence of the severe . . . storm had defendant not constructed the [dam] at all." *Orr*, 166 Fed. Cl. at 49 (alterations in original) (quoting *St. Bernard Par.*, 887 F.3d at 1363). The Plaintiffs do not contest that this is the correct inquiry. We, too, agree that the Federal Circuit's rule is the appropriate standard. *Cf. United States v. Sponenbarger*, 308 U.S. 256, 266 (1939) ("If major floods may sometime in the future overrun the river's banks despite — not because of — the Government's best efforts, the Government has not taken respondent's property."). The Plaintiffs have the burden to "establish that the government action caused the injury." *St. Bernard Par.*, 887 F.3d at 1362.

At summary judgment, the Authorities provided the report of their expert, Dr. Simons, who explained that "the inflow (of rainfall and runoff) into the Toledo Bend reservoir greatly exceeded the outflow because of the significant storage of stormwater in the reservoir during the March 2016 event." Dr. Simons concluded that the dam mitigated the peak flows from the flooding and, had it not been built, water levels would have been approximately nine feet higher. In addition, the Authorities attached a FERC review of the March 2016 incident. The review concluded there were significant flows into the Sabine River from tributaries downstream. In other

words, the outflow from the dam itself did not solely contribute to the flooding.

The Plaintiffs insist that the following creates a genuine dispute of material fact on causation: (1) the magistrate judge's conclusions in the order on the Authorities' motion for reconsideration and (2) the Plaintiffs' experts' report and deposition testimony.

First, we review the magistrate judge's order denying reconsideration of denial of the Authorities' motion to exclude the Plaintiffs' experts. The magistrate judge did not make factual findings on the appropriate inferences to be drawn from those expert reports. The Plaintiffs' selection of quotes from the magistrate judge's order have little bearing on this matter.

Second, we examine the experts' opinions. The Plaintiffs' experts jointly created a report, the "Rimkus Report", which detailed their conclusions regarding the influence of the Toledo Bend Dam on flooding. After considering and then reconsidering a motion to exclude, the magistrate judge struck a portion of the report which parroted the conclusions of a master's thesis written by an engineering student. The district court accepted the order. The redacted but still-surviving report, combined with several brief deposition excerpts, is the only admissible evidence the Plaintiffs put forward at summary judgment to demonstrate causation.

The Rimkus Report concludes that the "downstream flooding in the Lower Sabine River Basin in March 2016 was more extensive than if the dam were not present." For the report to create a genuine factual dispute, the report cannot be based on "speculation, improbable inferences, or unsubstantiated assertions." *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015) (quoting *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012)).

We start our analysis with a brief explanation of terms. The proper word for the volume of water moving down a stream or river per unit of time is discharge or flow. *How Streamflow is Measured*, U.S. GEOLOGICAL SURVEY (June 13, 2018), https://www.usgs.gov/water-science-school/science/how-streamflow-measured. Discharge is measured in cubic feet per second ("cfs"). *Id.*

To reach the Rimkus Report's conclusion, the experts proceeded down this path of logic. The experts adopted the flow rate estimated for a no-dam scenario by a model in Achutam Baral's Master's Thesis: 75,000 cfs. This portion was excluded from the Report by the magistrate judge as improper parroting. The experts testified that they did not undertake any independent modeling to recreate the 75,000 cfs figure. Next, the experts used the excluded figure, 75,000 cfs, and accounted for inflows downstream of the dam to come up with a peak discharge for the 2016 event without the influence of the Toledo Dam: 75,000 cfs to 145,000 cfs. The experts then calculated the expected flooding if that peak discharge had occurred, rather than the estimated 208,000 cfs from the open spillways. The experts concluded that flooding in the no-dam scenario was less severe. The 75,000 cfs figure from Baral's thesis underlies this entire chain of logic. Without the excluded portion, the conclusion is unsubstantiated.

The Plaintiffs also allege another theory supports the Report's ultimate conclusion: expert analysis of historic, pre-dam peak discharge rates on the Sabine. The magistrate judge credited this alternative reasoning as the basis for not excluding the entire Report. In this part of the report, historical data of several Sabine River stations were examined for the discharge rates from before the dam was constructed in the late 1960s. During two large floods in 1945 and 1957, the peak discharge at a station upstream of the current dam, Logansport, was 90,600 cfs and 61,000 cfs, respectively. At two downstream stations during the 1957 flood, the discharge was 52,000 cfs

and 53,000 cfs.  The experts used the lowest and highest of those numbers, 52,000 cfs and 90,600 cfs, as the range of discharge for the 2016 no-dam scenario, in effect arguing that these were the maximum expected discharges from the Sabine River during a flood event prior to the building of the dam.

While we would be "remiss to attempt a *Daubert* inquiry at the appellate level . . . it would be equally remiss for us to ignore the fact that a plaintiff's expert evidence lacks any rational probative value." *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000).  The Plaintiffs' experts do not extrapolate from this estimated discharge range — gleaned from isolated points of historical data — to an analysis of the flooding from the March 2016 storm.  The Plaintiffs cite no evidence in the record as to what the flooding levels might have been in 2016 if the discharge had been at the high or low end of the historical range.  The only alternative flooding levels the Plaintiffs ever put forward were rooted in the Baral 75,000 cfs figure.

Moreover, "if evidence gives rise to numerous inferences which are equally plausible, yet only one inference is consistent with the plaintiff's theory, the plaintiff has failed to offer evidence which is 'significantly probative.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  There are numerous other equally plausible logical inferences from the historical data presented by the Plaintiffs; for example, the rainfall duration and location in the 2016 storm differed from the 1957 and 1945 storms.  Indeed, the Rimkus Report itself shows the reservoir received peak inflows more than quadruple the high estimate of the estimated discharge obtained from the historical analysis, further undermining the plausibility of the Plaintiffs' suggested inference.  The Plaintiffs attempt to plug the holes in the chain of inferences with additional explanation in their briefs, but such attorney argument does not constitute evidence creating a genuine dispute of material fact.

No. 25-40410

We are sensitive to the particular factual difficulties in proving a counter-factual: the no-dam scenario.  Still, nothing in the record, after exclusion of all the data from the master's thesis, supports that the flooding would have been less extensive without the Toledo Bend Dam.  "[T]here is a level of conclusoriness below which an affidavit must not sink if it is to provide the basis for a genuine issue of material fact." *Orthopedic & Sports Injury Clinic v. Wang Lab., Inc.,* 922 F.2d 220, 224 (5th Cir. 1991).  We conclude the Rimkus Report sits below that level.

The Plaintiffs have failed to show a genuine dispute of material fact as to causation, an essential element of their takings claim.

AFFIRMED.